On Rehearing.
McBRIDE, Judge.
A rehearing was granted in this case because we entertained doubts that, we had properly appraised the evidence and correctly found the- facts respecting the course of conduct of the three defendants in connection with the building of the many houses in the subdivisions known as' "Kenner Heights” and “Pope Park.” Our original finding was that as respects Pope Park the price at which each house was sold was so low that it only actually represented the cost of construction plus $750, which was the value the Federal Housing Administration had placed on each lot, and that the only profit from the vendor arose as a result of the increased valuation of the land and that a profit of $600 per lot was divided among the three defendants, $200 to Pope, $200 to Irwin and $200 to Charbonnet. We also stated that there was not to be found in the record any express denial of the statements of Pope and his bookkeeper that the “land profits” were so divided.
We have carefully read and reread, sifted, and analyzed the confused record, .and going back to the inception of the building operations, we find that the course of conduct as between Pope, Irwin and Charbonnet and the part each played was as follows :
Some time during 1948 Pope and Irwin erected three houses on a “fifty-fifty basis.” Pope, as contractor, doing business under the name Pope Construction Company, then became desirous of erecting a large number of dwellings and asked Charbonnet to finance his operations and the latter agreed to do so. Charbonnet, who is an attorney at law, states that one of his clients owned certain squares of ground in a section in Jefferson Parish known as Kenner Heights and that he went to this client and arranged to buy the land for some $30,000, ultimately taking title in the name of Taylor Land Company, a corporation which Charbonnet “owned.” In connection with the building program in Kenner Heights, Charbonnet's *144 only role, personally, was to lend the money to Pope so as to finance the cost of the erection of the houses. Irwin’s part was to supervise the work and in' addition to being the supervisor, he was to see to it that the money which Charbonnet advanced to Pope was properly expended and applied by the latter. ‘ Charbonnet states that the houses were built for Taylor Land Company which, as owner, entered into building contracts with Pope Construction Company, as contractor, for the erection of the dwelling units. It appears that in the early stage of the building activities, Charbonnet learned that Pope was misapplying some of the funds which he had advanced and that Pope’s shortage amounted to about $8,000. Charbonnet .thereupon stopped making monetary advances and demanded that Pope protect him in the future by furnishing a fidelity bond before agreeing to continue to finance the operations. None of these assertions by Charbonnet are denied by Pope. It was then that Irwin entered the scene; he appeared as Pope’s surety and the building of the houses for Taylor Land Company proceeded. It is also admitted by Pope that in consideration of Irwin’s acting as surety for Pope and for his services as supervisor of the building activities, Irwin was paid by Pope the sum of $200 per house out of the proceeds of each sale. Irwin, in addition to being supervisor of the buildings, was also authorized to countersign Pope’s checks so that all parties would be adequately assured that funds would not be misapplied.
Pope maintains that Charbonnet received a $500 profit out of the sale of each house in Kenner Heights as consideration for having supplied the money with which to build, but Charbonnet denies this and asserts that the arrangement was that Taylor Land Company, for whom Pope, as contractor, was building the houses, would sell the houses to Pope, or to his nominee, at a price of $500 over and above what the building of each house had cost and that whenever Pope found a purchaser for a house, he would c.all upon Charbonnet who would have Taylor Land Company transfer title to the property to the purchaser. Charbonnet insists that the corporation and not he, personally, made the profit of $500 per house. He testified that the corporation reported such profits on its income tax returns.
The above constitutes a gist of the pertinent evidence relative to the activities, which took place with reference to Kenner Heights, and although all operations had ceased in that subdivision prior to the accrual of plaintiff’s claim, we have examined the facts and have set them forth in order to show the modus operandi and the relationship of Irwin and Charbonnet with Pope Construction Company.
Eventually there was no more land left in Kenner Heights on which to build and Charbonnet located a suitable tract of land known as “Highway Park” which was eventually purchased. Title was taken in the names of Taylor Land Company and William P. Irwin in the proportions of an undivided two-thirds to the former and a one-third interest to Irwin. Irwin’s interest was subsequently transferred to a corporation known as Irwin Land Company.
Pope undertook to resume his operations in Highway Park, which was renamed “Pope Park,” but on a different basis than prevailed with reference to Kenner Heights. Charbonnet, representing Taylor Land Company, had given a verbal option to Pope to buy part of the Highway Park tract and in due time twelve squares of the land which Taylor Land Company and Irwin Land Company acquired, as aforesaid, were transferred to a corporation known as Pope Park, Inc., in which C. W. Pope was the principal stockholder, undisputed testimony showing that he owned all of the corporate capital stock save two qualifying shares. Charbonnet maintains that the twelve squares were sold and delivered to Pope Park, Inc., on the basis of $750 per lot, on which purchase price Pope paid about $100 per lot in cash and the balance of the price was carried as a mortgage on the property. Pope was to erect the houses in Pope Park for his own account, all profits to belong to-him.
*145 The fact that Charbonnet continued to finance the operations of Pope Construction Company in building the houses in Pope Park is not disputed, and the record shows that Pope Construction Company issued numerous checks to Charbonnet in varying sums, the total of which equals a considerable amount. Donnes, Pope’s bookkeeper, stated that many of these checks were not issued in representation of repayments of money advanced by Charbonnet but they actually were for Charbonnet’s share of land profits at the rate of $200 per lot. He explained that when a house was sold the price thereof included $750 which was for the lot and was in excess of what the land had cost. However, it clearly appears that Donnes in giving the testimony was making statements relative to matters of which he had no personal knowledge and that the statements were merely based on what had been told to him by Pope. He admitted as much to the trial judge who remarked that the testimony was pure hearsay.
Pope insisted that there had been “land profits” and that these, pursuant to the agreement of the parties, were divided among himself, Irwin and Charbonnet, and he claimed that the three were partners in the building operations in Pope Park.
Charbonnet, on the other hand, denied vehemently that there were any “land profits” or that the proceeds of any sales were divided among the three parties. He stated that whenever Pope was ready to transfer title to a house in Pope Park to a purchaser, he, Charbonnet, would-be present at the sale and would, on behalf of Taylor Land Company and Irwin Land Company, release the particular lot which was being sold from the vendor’s lien mortgage upon Pope paying over to him on behalf of the two corporations the amount to warrant the release of the particular lot from the effects of the mortgage. Charbonnet states that he received all of such payments on the mortgage for the account of Taylor Land Company and Irwin Land Company which he was authorized to represent.
The plaintiff called as a witness Miss Dorothy Mclnnes, its freight agent at Ken-ner, Louisiana, who, in addition to testifying concerning the correctness of the amount of the claim asserted by plaintiff, went into the question of, whether the three defendants were doing business as a partnership. All that the witness could say regarding this phase of the matter is that when plaintiff’s bills reached the delinquent stage, she called Pope, who suggested that she contact Charbonnet. She states that Charbonnet merely asked her to mail to him an itemized statement of the claim. Shortly thereafter two checks were’received from Pope aggregating $626.49 which upon being deposited were returned by the drawee bank marked “insufficient funds,” whereupon Miss Mclnnes called Pope, who told her that Charbonnet and Irwin had neglected to deposit in the bank an amount sufficient to cover the checks. Miss Mclnnes states that she telephoned Irwin about, the checks and that all he told her was to call Charbonnet and that when she did call Charbonnet, he stated to her: “We will start liquidating Mr. Pope’s indebtedness as soon as Pope’s reorganization is completed.” This conversation took place in October 1950 and was about the time that the corporation Quick Realty Company, mentioned in our original opinion, was formed for the specific purpose of taking over Pope’s assets for the purpose of straightening out Pope’s tangled business affairs.
In our former opinion we stated that' the fact was conceded that the price at which each house was sold actually represented the cost of the construction plus $750, which was the increased value of the land, and we also stated that there was in the record no express denial of the statements of the bookkeeper employed by Pope to keep the books of the construction company to the effect that the “land profits” of $750-in each case had been divided amongst the three parties. We confess we fell into error in making these observations.
There is to be found in the record several express denials emanating from both Irwin *146 and Charbonnet that there ever was a division of any land profit among the three parties. Irwin insists that he, personally, had nothing whatever to do with the building operations in Pope Park and that his corporation, Irwin Land Company, was only interested as one of the vendors of the land.
Charbonnet was much more emphatic in his denials that a partnership existed or that there was a division of land profits. He claims that the only thing he received out of the sales of the houses in Pope Park was the return of the money which he had loaned and advanced to Pope with which to finance the erection of the buildings plus six percent interest. For instance, at one point he testified :
“I repeat that I have never received five cents of Pope’s profit. * * *
“I further deny that C. W. Pope, William P. Irwin and myself ever had any agreement to split any of the profits of the Pope Construction Company. I am not a builder of houses. I buy land and develop it and sell it. I finance people that need financing, but I do not engage in any type of construction.”
Charbonnet at another point in his testimony said:
“We had no interest in Pope Park, Inc. We had no agreement to get any of the profits out of Pope Park, Inc. The Irwin Land Company and the Taylor Land Company sold land to Pope Park, Inc., at a fixed price, and we expected that price paid.”
In answer to a question propounded by the judge, “What funds were due you personally ?” Charbonnet replied:
“Funds for personally financing his payroll to get him started. I financed it entirely on a flat six percent (6%) basis. I got no part of his profits. There was no agreement to pay me any profits, and I did not look for any profits. And, as these checks will show, it was only within the last month or so of his operations that we got most of our money back. It was only in the last month or so, when everybody pressed him, that it was gotten back.”
When confronted by many of the checks which had been issued to him individually and asked to state what they represented, Charbonnet made this emphatic reply:
“You may have your ‘raft’ or group of checks; but I also have my group, which totals some One Plundred Sixty Thousand Dollars ($160,000.00). When you want to match checks, I will match them with you. And I say to you, that every nickle represented by those checks was put up, either in land or in cash to finance him; and not one nickle of that represents any ‘profits.’ ”
It seems to us that Charbonnet’s statements, which are fully corroborated by Irwin, carry much more weight than the testimony which Pope gave and of which there is no corroboration or substantiation. Pope’s counsel argue that the testimony of the witnesses Donnes and Miss Mclnnes was corroborative of Pope’s testimony to the extent that there was an agreement or understanding between the three defendants which constituted them partners or joint adventurers. We do not agree with counsel. There is no evidence at all in the record supporting Pope’s statements on this all-important feature of their case. Donnes’ testimony was rank hearsay and while it was admitted by the trial judge because no objection was made to the reception thereof, its probative value is nil. All that Miss Mclnnes said was that she called .Irwin and Charbonnet by telephone after she had just spoken to Pope about the bills and the returned checks and he told her to call the others. Neither Irwin nor Charbonnet said anything to Miss Mclnnes which intimated that they were liable to plaintiff for any amount or led her to believe that they were Pope’s partners.
The trial judge believed the testimony of Irwin or Charbonnet else he would not have dismissed plaintiff’s suit as to these de *147 fendants, and we see no valid reason for disregarding their statements and accepting the unsupported testimony of Pope instead.
We are concerned in this case with the question whether under the evidence Char-bonnet and Irwin were partners of or joint adventurers with Pope and as such are liable with him for the amount of plaintiff’s demand. Nothing more or less than a question of fact is thus presented which is to be treated in no different manner than any other factual issue where there is conflicting evidence. The reversal of the judgment would necessitate our holding that the trial court’s conclusion based on his appraisal of the evidence and the credibility of the witnesses is obviously erroneous.
We agree with the trial judge that the evidence in the case does not show that the relationship of partners or joint adventurers existed between the three parties. We considered all of the evidence adduced with respect to the developments in Kenner Heights in order that we might be able to determine the course of conduct of the parties and their relationship to each other, and nothing that was done with reference to the activities in Kenner Heights would lead us to believe that the parties were carrying on as partners or joint adventurers. Nor can it be said that such relationship existed with respect to Pope Park. All that Charbonnet did was to lend money to Pope to finance his buildings and all that was repaid to Charbonnet was the money that had been loaned plus interest at the rate of six per cent. Irwin personally appears to have had no connection whatever with the transactions in Pope Park.
It is true, as counsel for the appellants point out, that Charbonnet and Irwin gave their testimony only on their cross-examination under LSA-R.S. 13:3662 and that there is no testimony emanating from them on direct examination. Even though the two parties were never called to the witness stand to testify in their own behalf, we know of no rule of law to the effect that their testimony given on cross-examination under tbe aforesaid statute may not be considered in their behalf to the same extent as though the testimony had been given on direct examination.
The law is well settled that the creditor claiming that a partnership is his debtor has the burden of proving that the-partnership existed and that the parties against whom the suit is directed were members of the partnership. LSA-C.C., arts. 2801, 2805; Robertson v. Cambon, 176. La. 753, 754, 146 So. 738. Under the evidence submitted in the case, our conclusion, is that plaintiff has not carried such burden and that the judgment appealed from is. correct.
Therefore our original decree is set aside and recalled, and the judgment of the lower court is now affirmed.
Original decree recalled; judgment affirmed.